1
2
3
4
5
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
6
7       MATTHEW SORENSEN, an individual,

8                        Plaintiff,                    CASE NO. 2:18-cv-00446-BAT

9             v.                                       **ORDER GRANTING
                                                       DEFENDANTS' MOTION FOR
10      CPC SPECIAL LOGISTICS WEST, LLC, a             SUMMARY JUDGMENT**
        Washington corporation, and LARRY
11      KELLER, an individual,

12                        Defendants.

13          Plaintiff Matthew Sorensen sues Defendants CPC Special Logistics West, LLC ("CPC")

14   and Larry Keller for violation of Washington's Law Against Discrimination ("WLAD")

15   including disability discrimination, failure to accommodate disability, and retaliation. He also

16   sues for wrongful termination in violation of public policy. Dkt. 1-1. Plaintiff, who was a

17   commercial driver for Defendant CPC, alleges Defendants wrongfully terminated him for

18   refusing to take a random drug test when his shoulder surgery and pain medication interfered

19   with his ability to provide a full sample and he had to leave the testing area for a doctor's

20   appointment to have the stitches removed from his shoulder. *Id.* at 2-3.

21          Defendants move for summary judgment dismissal of Plaintiff's claims pursuant to Fed.

22   R. Civ. P. 56. Defendants contend that Plaintiff's employment was immediately terminated

23   pursuant to CPC policy after Plaintiff refused to take a Department of Transportation ("DOT")

mandated random drug test and that Plaintiff was actually paid more than he would have
received with the applicable hourly rate plus overtime. Dkt. 20.

The Court finds that Defendants are entitled to summary judgment on all of Mr.
Sorensen's claims.

## FACTS

CPC, which is headquartered in St. Louis, Missouri, is a provider of professional driver
services for private truck fleets in North America. CPC has twenty regional offices and over
3,000 employees providing transportation services to customer in over 300 locations. Dkt. 22,
Declaration of Larry Foltz ("Foltz Decl.") ¶ 2. Defendant Larry Keller is a CPC regional
manager who works primarily out of CPC's Vancouver, Washington office. Dkt. 23, Declaration
of Larry Keller ("Keller Decl.") ¶ 1. Mr. Keller was Mr. Sorensen's supervisor at the time Mr.
Sorensen's employment was terminated. *Id*. Keller Decl. ¶ 1.

**A.    December 2015 Shoulder Injury**

CPC hired Mr. Sorensen as a truck driver in August of 2008. Dkt. 26, Declaration of
Peter Montine, Ex. 1, Sorensen Dep. at 23:15–17; 98:1–24; 101:23–102:4. In December of 2015,
Mr. Sorensen tore his left rotator cuff while driving a CPC truck. *Id*. at 98:1–24; Dkt. 25,
Declaration of Matthew Sorensen, ¶ 2. When he reported his injury to Defendant Keller, Keller
told Mr. Sorensen to see a doctor. Dkt. 26, Montine Dec., Ex. 1 (Sorensen Dep.) at 104:10–23.
Mr. Sorensen's doctor diagnosed a torn left rotator cuff and he put Mr. Sorensen on light duty.
*Id*. at 110:18–111:11; 111:12–25.

Mr. Sorensen was assigned to work in a thrift store, but because the work required him to
lift boxes above his head and to load and unload trucks, it exacerbated his shoulder injury. *Id*. at

113:12–114:9. Mr. Sorensen informed CPC that he was being forced to work beyond his restrictions, and his doctor then took him off duty completely. *Id*. at 114:10–24.

Mr. Sorensen applied for worker's compensation on December 8, 2015. *Id*. at 117:7–12. He began receiving payment within a month and "CPC was throwing a little bit in there too. A new policy they had, I believe." *Id*. at 117: 15-20. Mr. Sorensen testified that later in December, he was contacted by a private investigator, working on behalf of CPC, who called him almost daily for about a week, to interview him regarding his injury. Dkt. 25, Sorensen Decl., ¶3; Dkt. 26, Montine Decl., Ex. 1, Sorensen Dep. at 203:24–206:15.

This was Mr. Sorensen's third worker's compensation claim with CPC, but was his first claim during the time Defendant Keller was his manager. Dkt. 26, Montine Decl., Ex. 1, Sorensen Dep. at 97:24–98:3; 132:4–133:8.

The Washington Employment Security Department ("ESD") provided CPC with notice that Mr. Sorensen's surgery would take place between January 8, 2016, and February 18, 2016. Dkt. 26, Montine Decl., Ex. 2. The surgery was performed on January 19, 2016 and Mr. Sorensen was scheduled for a post-op appointment on January 28, 2016, at 1:40 p.m. at the Auburn Clinic. Dkt. 27, Ex. 2. Following the surgery, Mr. Sorensen's doctor prescribed Oxycodone, to be taken every four hours for pain. *Id.*, Montine Decl., Ex. 1, Sorensen Dep. at 119:20–120:7; 121:5–9. Mr. Sorensen testified that the Oxycodone made him feel like a "zombie," like he was in a "brain fog," and caused him difficulty in urinating. *Id*. at 120:8–121:22; 125:2–14. Mr. Sorensen was also taking Oxybutynin, which had been prescribed for him in 2014 for an overactive bladder and between the two medications, he states he urinated as little as once per day following his surgery. *Id*. at 107:14–108:3; 120:9–121:9.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 3

**B.** **Federal Regulations Requiring Random Drug Testing of Commercial Drivers**

The DOT has promulgated a comprehensive regulatory scheme to promote public safety. This regulatory scheme includes detailed provisions regulating drug and alcohol testing. *See, e.g.*, 49 CFR § 382.101 ("The purpose of this part is to establish programs designed to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles."); 49 CFR § 40.1. CPC's commercial drivers fall under DOT regulations that regulate commercial drivers.

DOT regulations require employers to perform drug tests on their employees in safety-sensitive functions prior to employment, after accidents, upon reasonable suspicion, and under other circumstances. 49 CFR §§ 382.301–07. The regulations also require the employees to submit to the random tests. 49 CFR § 382.305. The regulations regulate the conduct of employers, employees, medical review officers, test centers, laboratories, and third-party service agents. *See generally* 49 CFR § 40.1 et seq. The regulations require employers to ensure that the selection of drivers for random tests "shall be made by a scientifically valid method, such as a random number table or a computer-based random number generator that is matched with drivers' Social Security numbers, payroll identification numbers, or other comparable identifying numbers." 49 CFR § 382.305(i)(1). "Each driver selected for testing shall be tested during the selection period." 49 CFR § 382.305(i)(3).

The regulations do not require, and do not prohibit, the inclusion of employees on workers' compensation in the random testing pool. CPC requires that its drivers on workers' compensation be included in the random selection pool, and has for at least the past ten years. Dkt. 22, Foltz Decl. ¶ 5; Dkt. 21, Declaration of Robin Blackwell ("Blackwell Decl.") ¶ 6; *Id.* Exs. 2–4. According to Larry Foltz, CPC's Drug and Alcohol Program Administrator at the time,

this is because workers' compensation is temporary and most employees on workers'

compensation usually return to their safety-sensitive function of commercial driving. CPC has

applied this policy consistently for over a decade, and in that time has not granted an exemption

from reporting for a random drug test to any employee solely because the employee is on

workers' compensation. *Id.*, Foltz Decl. ¶ 5. In nearly every email between 2014 and 2016, in

which CPC sent random lists of the employees to be tested to its regional managers, CPC

employee Robin Blackwell included a reminder that "[a]s always, employees on Worker's Comp

are required to participate in random drug testing." Dkt. 21, Blackwell Decl. Exs. 2–4.

**C.      CPC's Contract With National Diagnostics, Inc.**

Employers may use service agents to make the selections of its drivers for random

testing. 49 CFR § 382.305(i)(3). CPC has been under contract with National Diagnostics, Inc.,[1] a

North-Carolina-based company, for over 15 years to help CPC administer its drug testing

program nationally in strict compliance with DOT regulations. Dkt. 22, Foltz Decl. ¶ 7, Ex. 1 at

17[2]. NDI serves as CPC's Medical Review Officer, a position required by and regulated by DOT

regulations. *Id.* ¶ 7; *see also* 49 CFR §§ 40.121–40.169.

NDI is responsible for generating all random selection lists for CPC. Dkt. 22, Foltz Decl.

¶ 8. NDI places the social security numbers of CPC employees subject to DOT random testing

regulations in a random number generator. *Id.*, Foltz Decl. ¶ 8, Ex. 1 at 18; Dkt. 25, Blackwell

Decl. ¶ 4, Ex. 1. Bi-monthly, the numbers produced are provided to the CPC drug and alcohol

program administration office in St. Louis, Missouri. Dkt. 22, Foltz Decl. ¶ 8, Ex. 1 at 25. This

---

[1] NDI is now a division of Hire Right.

[2] CM/ECF numbering.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 5

information is transmitted to the appropriate CPC regional office to notify the employee. *Id.*, Foltz Decl. ¶ 8, Ex. 1 at 25; Dkt. 21, Blackwell Decl. ¶¶ 4–5, Exs. 2–4; Dkt. 23, Keller Decl. ¶ 4. An explanation of the random selection process and NDI's role in it is included in CPC's Policy & Safety Handbook, which CPC employees, including Mr. Sorensen, receive and sign. Dkt. 22, Foltz Decl. ¶ 8, Ex. 1; Dkt. 24, Declaration of Eric Franz ("Franz Decl.") Exs. 2, 3 (Sorensen signature) and Ex. 1, Sorensen Dep. 136:22–140:24. Once CPC provides its employees' information to NDI at the outset, CPC has no control over the random selection process, and no authority or ability to alter or change any of the random lists generated by NDI. Dkt. 22, Foltz Decl. ¶ 8; Dkt. 21, Blackwell Decl. ¶ 4.

NDI contracts with hundreds of local clinics across the country to conduct the random testing of CPC's employees. Dkt. 22, Foltz Decl. ¶ 10. When CPC's regional managers receive their list of employees who were selected for random testing, they must ensure that each employee on that list is tested at one of those clinics within a seven-week period. *Id.*, Foltz Decl. ¶ 10. DOT regulations require that employers ensure that each random test is "unannounced." 49 CFR § 382.305(k)(1).

In accordance with DOT regulations and CPC policy, CPC regional managers contact the employees on their NDI-generated random selection lists and instruct them to report to clinics immediately. Dkt. 22, Foltz Decl. ¶ 11; Dkt. 23, Keller Decl. ¶ 5, Ex. 1; 49; CFR § 382.305(k)(2) (employers "shall require that each driver who is notified of selection" for random tests "proceeds to the test site immediately."). Regional managers then electronically send a "Service Notification and Authorization Form" to the appropriate clinic. Dkt. 22, Foltz Decl. ¶ 11; Dkt. 23, Keller Decl. ¶ 6, Ex. 2. Test center employees complete a "Federal Drug Testing Custody

and Control Form" and write the employee's name, the purpose of the test, the regulation the test is conducted under, and other information.

Alternates for an employee who asserts that he or she is unavailable are only allowed under circumstances in which the employee is truly unavailable for the entire two-month testing period. Dkt. 22, Foltz Decl. ¶ 12. Because DOT regulations require testing of everyone who is randomly selected, alternates are rarely granted, and must be approved by Mr. Foltz's office.[3] *Id.* Regional managers, such as Mr. Keller, do not have discretion or authority to appoint an alternate, and they do not have the discretion to allow an employee on the random selection list to skip a required test. *Id.*

**D.      DOT Regulations Define the Conduct That Constitutes a Refusal to Test**

Test center procedures are subject to DOT regulations. *See, e.g.*, 49 CFR §§ 40.31–51. Test center staff must ensure that employees being tested are "under the supervision of a collector at all times when permitted into the site." 49 CFR § 40.43(d)(3). If an employee is unable to provide a sufficient regulation-mandated amount of urine, the collector must discard the insufficient specimen, and "urge the employee to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours, or until the individual has provided a sufficient urine specimen, whichever occurs first." 49 CFR § 40.193(b)(1)–(2). The collector must also "inform the employee of, the time at which the three-hour period begins and ends." 49 CFR § 40.193(b)(2). If the employee "refuses to make the attempt to provide a new urine specimen or leaves the collection site before the collection process is complete," the collector "must

_____

[3] Mr. Sorensen argues that if alternates were "rarely granted," this necessarily means that they were sometimes granted and therefore, CPC could have granted Sorensen an alternate but deliberately chose not to do so. Dkt. 25, p. 10. There is no evidence to support this supposition or evidence that CPC granted alternates to other drivers on worker's compensation.

1 discontinue the collection, note the fact on the 'Remarks' line of the CCF (Step 2), and

2 immediately notify the [Designated Employer Representative]. This is a refusal to test." 49 CFR

3 § 40.193(b)(3) (emphasis added).

4      DOT regulations also state that an employee has "refused to take a drug test" if he or she

5 fails "to remain at the testing site until the testing process is complete." 49 CFR § 40.191(a)(2). It

6 is also a refusal if the employee fails "to cooperate with any part of the testing process." 49 CFR

7 § 40.191(a)(8). If an employee attempts to provide an adequate specimen but is unable to after

8 the DOT-mandated three-hour period, the Designated Employer Representative ("DER") must

9 direct the employee to obtain a medical evaluation from a licensed physician within five days to

10 determine whether "[a] medical condition has, or with a high degree of probability could have,

11 precluded the employee from providing a sufficient amount of urine." 49 CFR § 40.193(c)–(d).

12 However, if the employee leaves before the test is complete, DOT regulations deem it a refusal.

13 **E.**    **Comprehensive Substance Abuse Policy**

14      DOT regulations do not address employment decisions such as hiring or firing. U.S

15 Department of Transportation, Office of Drug & Alcohol Policy & Compliance, What

16 Employees Need to Know About DOT Drug & Alcohol Testing (Rev. April 2014)[4] ("All

17 employment decisions are the responsibility of the employers.").

18      CPC maintains a comprehensive, definitive policy regarding drug and alcohol abuse. This

19 policy, G-006 of CPC's Policy & Safety Handbook, is provided to all CPC drivers. Dkt. 22,

20 Foltz Decl. ¶ 16; Ex. 1 at 7–32. CPC drivers are required to acknowledge receipt of, and agree to

21 comply with, CPC policies as a condition of employment. *Id.*, Foltz Decl. ¶ 16; Ex. 1 at

22 _____

23 [4] Available online at
https://www.transportation.gov/sites/dot.gov/files/docs/Employee_Handbook_Eng_2014_A.pdf.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 8

CPC0000748. Mr. Sorensen received and signed CPC's Substance Abuse Policy. Dkt. 24, Franz

Decl. Exs. 2, 3; Ex. 1, Sorensen Dep. 136:22–140:24. CPC policy states, in relevant part:

> "ANY DRIVER WHO REFUSES TO SUBMIT TO A POST-ACCIDENT,
> RANDOM, REASONABLE SUSPICION, OR FOLLOW-UP DRUG TEST IS
> PROHIBITED FROM PERFORMING OR CONTINUING TO PERFORM ANY
> SAFETY SENSITIVE FUNCTION AND WILL BE TERMINATED BY CPC.*
> REFUSAL TO SUBMIT TO A DRUG TEST IS CONSIDERED A POSITIVE
> TEST."

Foltz Decl. Ex. 1 at 15. The asterisk refers to a separate page of the Handbook, which states that

this policy is "in addition to and independent from the requirements imposed by the Federal

Highway Administration." Dkt. 22, Foltz Decl. Ex. 1 at 19. A CPC policy that Mr. Sorensen

received and signed states further that no warning notice will be given prior to termination if the

discharge is for violation of CPC's Substance Abuse Policy (G-006). Dkt. 24, Franz Decl. Ex. 3

at SOREN 000097. In addition, the handbook states, in relevant part:

> NOTE: Under the regulations, a driver will be considered to have refused to
> submit to a required test if he/she either fails to provide an adequate urine
> specimen without a valid medical explanation, or engages in conduct which
> clearly obstructs the testing process; for example, by adulterating the specimen, or
> by failing to show up for the test within the time frame specified by the
> regulations or by the Company without an adequate explanation.

Dkt. 22-1, Foltz Decl., at 17.

CPC has applied this policy consistently for over twenty years. Dkt. 22, Foltz Decl. ¶ 17.

Every time an employee has refused to test, CPC has terminated that employee. *Id*., Foltz Decl. ¶

17; *id*. Ex. 2. Termination for violation of CPC's substance abuse policy is at the authority of the

drug and alcohol program administrator. Dkt. 22, Foltz Decl. ¶ 6. Regional managers do not have

authority to terminate CPC employees. *Id*.; Dkt. 23, Keller Decl. ¶ 8.

**F.      Random Drug Test - January 28, 2016**

Mr. Sorensen complied with several random drug tests during his time at CPC, and was familiar with the process. Dkt. 24, Franz Decl., Ex. 4; Ex. 1.[5] On January 11, 2016, NDI generated its random lists of CPC employees to be tested for the January-February bi-monthly period. Dkt. 21, Blackwell Decl., Ex. 4. The next day, Robin Blackwell, an assistant to Larry Foltz, emailed CPC regional managers to instruct them that their random drug and alcohol selections "are now available to you on NDI's website under random selection date 01/11/2016." Dkt. 21, Blackwell Decl., Ex. 4 (Jan. 2016 email). Larry Keller, Mr. Sorensen's regional manager, received Robin's email, and was able to access his random list online on NDI's website for that two-month period. Dkt. 23, Keller Decl. ¶ 9., Ex. 1.

Mr. Keller was aware that Mr. Sorensen was on workers' compensation at the time for his shoulder injury. Dkt 23, Keller Decl. ¶ 10. After seeing Mr. Sorensen on the random list, Mr. Keller called Mr. Sorensen at or around 11:00 a.m. on January 28th and instructed him to report to the Kent, Washington branch of U.S. Health Works for testing. Dkt. 23, Keller Decl. ¶ 11; Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep. 153:18–21. Mr. Keller, as per usual, completed the Service Notification and Authorization Form and transmitted it to the same U.S. Health Works test center. Dkt. 23, Keller Decl. ¶ 11, Ex. 2.

In his deposition, Mr. Sorensen testified that he believes, but is not completely sure, that he told Defendant Keller that he was just out of surgery and that he was on pain narcotics. Dkt. 26, Montine Decl., Ex. 1, Sorensen Dep. at 166:17–168:19. In his declaration, Mr. Sorensen

---

[5] Mr. Sorensen took three other random drug tests during his employment with CPC; in October 2008, July 2011, and June 2015. Dkt. 26, Montine Decl., Ex. 3. He tested negative in each of his previous random tests. Id.

testified he told Defendant Keller that he had "just gotten out of surgery and that [he] was on

Oxycodone." He believes he also told Defendant Keller that he had a doctor's appointment that

afternoon. Dkt. 27, ¶ 6. Defendant Keller instructed Mr. Sorensen to report for his drug test that

day and that he needed to hurry. Id.

Mr. Sorensen drove himself to the test center shortly after. Dkt. 24, Franz Decl., Ex. 1,

Sorensen Dep. 166:17–168:16, and Ex. 4. The collector at U.S. Health Works provided a custody

and control form. *Id.*, Sorensen Dep. 170:23–171:15; Dkt. 24, Franz Decl. Ex. 5. The box for

"Random" for test type on the custody and control form is checked and circled. *Id.*, Franz Decl.

Ex. 5. Mr. Sorensen made a first attempt to provide a urine sample at 12:50. *Id.*, Franz Decl. Ex.

5; Ex. 1, Sorensen Dep. 155:4–10.

After his arrival at the clinic, Mr. Sorensen filled out some paperwork and was instructed

to provide a urine sample. *Id.*, Sorensen Dep. 173:2–174:7. Within five minutes, Mr. Sorensen

produced a sample, but the collector informed Mr. Sorensen that it was of insufficient quantity.

*Id.*, Sorensen Dep. 174:8–14. The collector informed Mr. Sorensen that he would have to remain

at the testing facility and attempt to provide another sample. *Id.*, Sorensen Dep. 177:14–19. Mr.

Sorensen told the collector that he had a doctor's appointment. *Id.*, Sorensen Dep. 177:25–178:6.

Mr. Sorensen did not inform the collector that he was on prescription medication (Oxycodone for

his shoulder pain). *Id.*, Sorensen Dep. 176:8–15. Mr. Sorensen said he had the bottle of

Oxycodone with him in his coat pocket, but he did not show it to the collector at the test center.

*Id.*, Sorensen Dep. 177:6–13.

The collector advised Mr. Sorensen that if he left the test center, it would be considered a

positive test if he left. *Id.*, Sorensen Dep. 178:22–24 ("Q: So he told you it would be a positive

1  test if you left, correct? A: Yes."). Mr. Sorensen left the test center about ten minutes later. *Id.*,
2  Sorensen Dep. 179:8–13.

3      Mr. Sorensen testified that he did not recall exactly how long he was at the test center,
4  but "I imagine maybe an hour," and "less than two." Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep.
5  158:8–12. The "Remarks" in the custody and control form state that the collector "informed
6  DER Larry Keller" at some point in the one o'clock hour.[6] The collector called Mr. Keller and
7  told him that Mr. Sorensen left the test site without completing the testing process. Dkt. 23,
8  Keller Decl. ¶ 12.

9      The next day, Mr. Foltz, who had sole authority to discipline or terminate employees who
10 violated CPC's substance abuse policy, sent a termination letter to Mr. Sorensen in the same
11 form that he sent to every other CPC employee. Dkt. 22, Foltz Decl. ¶¶ 6, 18, Ex. 3. Mr. Foltz
12 had never met or spoken to Mr. Sorensen when he sent the termination letter. *Id.*, Foltz Decl. ¶
13 19. Mr. Foltz states it was not necessary for him to speak with Mr. Sorensen prior to terminating
14 him because all employees who refuse tests are automatically terminated pursuant to CPC policy.
15 *Id.*, ¶ 19.

16     Within a week of his termination, Mr. Sorensen visited his surgeon, Dr. Richard P.
17 Martin, and his primary care provider, Dr. Nilo Santos. Dkt. 27, Sorensen Decl., Exs. 4–5; Dkt.
18 28, Santos Decl., ¶¶ 2, 8. In May 2014, Dr. Santos had previously diagnosed Mr. Sorensen with
19 an overactive bladder and prescribed Oxybutynin. *Id.*, ¶¶ 9-10. Dr. Santos states that decreased
20 frequency in the need to urinate and difficulty urinating on command are side effects of both
21 Oxybutynin and Oxycodone and the combination of these two medicines is what prevented Mr.

22

23  _____
    [6] The form states "13:[]5," where the "[]" is illegible.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 12

Sorensen from being able to provide a urine sample for the drug test. He also opines that it would have been very difficult for Mr. Sorensen to produce a urine sample on command even after three hours. *Id.*, ¶¶ 12-14. In addition, the Oxycodone would have caused a positive drug test, regardless of whether Mr. Sorensen was using any other drugs. *Id.*, ¶18. Dr. Santos also states that if Mr. Sorensen had missed his follow-up appointment with his surgeon, it could have negatively impacted his recovery. *Id.*

Mr. Sorensen was released for work October of 2016, nine months after his termination. Dkt. 26, Montine Decl., Ex. 1, pg. 199:19–200:1. Several months later, Mr. Sorensen wrote in a discharge questionnaire to the Washington State Employment Security Department:

> I made a poor decision to leave test because I couldn't give anymore urine was under heavy pain medication and had appt. with doctor to remove stitches believe I should have been replaced with other active driver – have everything documented.

Dkt. 24, Franz Decl., Ex. 6, p. 3.

### G.    Worker's Compensation Claim

ESD granted Mr. Sorensen's unemployment benefits. Dkt. 27, Sorensen Decl., Ex. 8. CPC appealed this decision, but the Office of Administrative Hearings (OAH) affirmed the ESD's decision. *Id*. The Administrative Law Judge held, "we note that the claimant was called for a random drug test while he was on medical leave, recovering from surgery and still under the effects of narcotics that he was using for pain" and that it did "not seem reasonable for the employer to have required him to undergo random drug testing at the time it did." *Id.*

### H.    "Mileage-Plus" Rate

CPC has two primary categories of drivers: delivery drivers and relay drivers. Relay drivers drive regular over-the-road routes to and from a domicile location or a cross-dock

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 13

operation in SeaTac, Washington to transfer points. Delivery drivers (or "peddle" drivers) work

delivery routes originating from the domicile location or cross-dock operation and deliver to

Walgreens locations. CPC originally hired Mr. Sorensen as a delivery driver. Dkt. 24, Franz

Decl., Ex. 1, Sorensen Dep. 31:19–23. In 2013 or 2014, Mr. Sorensen became a relay driver, the

position he served for the remainder of his time at CPC. *Id.*, Sorensen Dep. 31:19–21:11.

CPC pays delivery drivers a set hourly rate and overtime pay for any overtime hours

worked. *Id.*, Sorensen Dep. 38:15–19; Dkt. 23, Keller Decl. ¶ 14. CPC pays relay drivers a single

driver road mileage rate for all actual miles driven during the time they are driving, and the

applicable hourly rate (the same rate as delivery drivers) for all times they are not driving ("on

duty not driving" time). Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep. 38:25–39:3; Dkt. 23, Keller

Decl. ¶ 14; Dkt. 24, Franz Decl. Ex. 7. The purpose of including a mileage rate for relay drivers

is to incentivize efficient trips. Dkt. 23, Keller Decl. ¶ 15. Relay drivers drive long distances, and

spend the vast majority of their working hours on the highway. *Id.*, Keller Decl. ¶ 15. Delivery

drivers are paid entirely based on hours worked, and not by mileage, because much of their time

is spent in city limits where traffic is slow, and they have many non-driving functions that relay

drivers do not have. *Id.*, Keller Decl. ¶ 16.

CPC provides a breakdown of the hourly and mileage rates to its drivers, and provides a

new breakdown every time the rates change. Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep. 78:11–

82:2; Dkt. 23, Keller Decl. ¶ 17, Ex. 3. In his declaration, Mr. Sorensen contends that CPC never

informed him or how it calculated his mileage rate or whether the rate accounted for his overtime

hours. Dkt. 27, Sorensen Decl., ¶ 16. However, at his deposition, Mr. Sorensen testified that he

received and signed a copy of each new rate change. Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep.

81:25–82:2. Additionally, Mr. Sorensen's earnings statements state the hourly and mileage rate

1    that CPC paid Mr. Sorensen for each pay period. Dkt. 24, Franz Decl. Ex. 7. The following 12-

2    month pay rates were in effect during the relevant time period:

| Effective Date | Hourly Rate | Mileage Rate |
|---|---|---|
| 09/01/2013 | $21.15 | $.44 |
| 08/31/2014 | $21.15 | $.44 |
| 03/15/2015 | $23.00 | $.46 |
| 08/30/2015 | $23.85 | $.47 |

6    Dkt. 23, Keller Decl. ¶ 18, Ex. 3. CPC's hourly rate was above average for the industry. Dkt. 24,

7    Ex. 1, Sorensen Dep. 88:13–17.

8        All mileage and all hours are tracked through on-board computer systems for both relay

9    and delivery drivers and recorded in CPC's payroll systems. Mr. Sorensen testified at his

10    deposition that he always recorded his hours and mileage accurately (Dkt. 24, Franz Decl., Ex. 1,

11    Sorensen Dep. 42:13–16); every time he believed there was a malfunction, he corrected it (*id.*,

12    Sorensen Dep. 43:4–6); he has no reason to believe that CPC's payroll data showing his mileage

13    and hours is inaccurate (*id.*, Sorensen Dep. 62:3–11); and he has no reason to believe that his

14    paychecks did not ultimately reflect the correct amount of pay for the correct number of miles

15    and hours he worked, at the correct rates (*id.*, Sorensen Dep 49:12–22).

16        In a prior overtime complaint, Mr. Sorensen submitted handwritten "estimates" of his

17    worked hours that showed him having worked substantially more hours than supported by CPC

18    records, and based his demand on those estimates. Dkt. 24, Franz Decl. Ex. 10; Ex. 1, Sorensen

19    Dep. 57:5–60:18. Mr. Sorensen first testified at his deposition that his estimates were

20    "conservative," and that he worked a "bare minimum of 12 hours per day, per shift, averaged."

21    *Id.*, Ex. 1, Sorensen Dep. 54:3–55:16. After reviewing his payroll records, Mr. Sorensen

22    acknowledged that his estimates were inaccurate, that they overstated his hours, and that CPC's

23    payroll records are more reliable. *Id.*, Sorensen Dep. 69:14–74:10.

Mr. Sorensen testified that he would have preferred to be paid a straight hourly rate just like a delivery driver. Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep 86:25–87:5. According to CPC records, from March 2014 through Mr. Sorensen's final work day in December 2015, he made $1,506.41 more under the mileage plus formula for relay drivers than he would have if he was paid the applicable hourly rate plus overtime. *Id.*, Franz Decl. Ex. 9.[7]

In his response Mr. Sorensen claims that CPC failed to pay him for at least 803.83 overtime hours. Using data provided by CPC, he calculates that he worked at least 812.06 hours of overtime between March 19, 2014 and December 8, 2015, but was paid for only 8.23 hours of overtime. Dkt. 26, Montine Decl., Exs. 7 and 8, p. 19 (3.73 hours), p. 99 (4.5 hours).

## SUMMARY JUDGMENT

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (2010). In support of a motion for summary judgment, the moving party need not negate the opponent's claim, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); rather, the moving party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict in favor of the opponent, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *See Beard v. Banks*, 548 U.S. 521, 529 (2006).

---

[7] The calculations in Exhibit 9 were done by CPC. Because CPC records all employee hours and miles, regardless of whether a driver is a delivery or relay driver, it is able to calculate what a relay driver would have been paid had they been on a straight hourly rate. The calculations can be confirmed with reference to Exhibit 8 to the Declaration of Eric Franz (payroll records that record Mr. Sorensen's "on duty" (non-driving) and driving hours). The calculation in Exhibit 9, to determine what Mr. Sorensen would have made had he been paid strictly on an hourly basis, was conducted by combining those hours records with the applicable hourly rate.

1        The moving party bears the burden of showing that there is no evidence which supports

2  an element essential to the non-movant's claim. *Celotex*, 477 U.S. 322. In order to defeat a

3  motion for summary judgment, the non-moving party must make more than conclusory

4  allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis v.*

5  *JR Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994). The general rule in the Ninth Circuit is that a

6  party cannot create an issue of fact by affidavit contradicting his prior deposition testimony."

7  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). Additionally, the "mere

8  existence of some alleged factual dispute between the parties will not defeat an otherwise

9  properly supported motion for summary judgment; the requirement is that there be no genuine

10  issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686

11  (2007) (citation omitted) (emphasis in original). A genuine issue of material fact exists if "a

12  reasonable jury could return a verdict for the nonmoving party." *United States v. Arango*, 670

13  F.3d 988, 992 (9th Cir.2012) (quoting *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505). Conversely,

14  "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

15  nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380, 127 S.Ct. 1769.

16                                      **DISCUSSION**

17  **A.**     **Disability Discrimination**

18        To survive summary judgment on a claim for disability discrimination, a plaintiff must

19  provide material evidence that (1) he or she had a disability; (2) he or she was able to perform

20  the essential functions of the job in question with reasonable accommodation; and (3) his or her

21  disability was a significant or substantial factor in the employer's decision to terminate him or

22  her. *Becker v. Cashman*, 128 Wn. App. 79, 114 P.3d 1210 (Div. 3 2005).

23

With regard to the first two elements of his disability claim, Mr. Sorensen alleges that his "inability to urinate was a disability at the time of his termination." Dkt. 1-1, ¶ 3.1. To prove that his difficulty urinating was a disability, Mr. Sorensen is required to prove that it constituted an "impairment of a major life activity." *Burchfiel v. Boeing Corp.*, 149 Wn. App. 468, 205 P.3d 145, 21 A.D. Cas. (BNA) 1249 (Div. 3 2009). The permanent or long-term impact of the impairment is also considered to determine whether a major life activity is restricted. *Id.* (citing *Braunling v. Countrywide Home Loans Inc.*, 220 F.3d 1154, 1157 (9th Cir.2000).

Mr. Sorensen fails to establish that his physical impairment "substantially limited" one or more of his major life activities. He also fails to establish the permanency or long-term impact of his impairment, which his doctor opined was created by the combination of two medications, one of which was prescribed post-op for pain. When asked at his deposition if his difficulty urinating prevented him from doing any specific activities, Mr. Sorensen replied: "Not that I can recall, no." Dkt. 24, Franz Decl., Exh. 1 – Sorensen Dep. 126:15–17.

With regard to the third element of his disability claim, Mr. Sorensen alleges that he was terminated for failing to complete a "supposedly random" drug test. Dkt. 1-1, ¶ 3.2. There is however, no evidence that the test was not random and did not comply with DOT regulations and CPC policy. Mr. Sorensen's name appeared on a randomly-generated list generated not by CPC, but by NDI. Mr. Sorensen does not contest that he failed to remain at the test site for the three hours required by DOT regulations. Dkt. 24, Franz Decl., Exh. 1, Sorensen Dep. 158:8–12; 49 CFR § 40.193(b)(1)–(3). After he left the test site before the test was complete, Mr. Sorensen was terminated by Larry Foltz, who had sole authority to terminate Mr. Sorensen's employment for non-compliance with the random test, and who had never met Mr. Sorensen and was not aware of Mr. Sorensen's medical condition when he made the decision to terminate him. Dkt. 22,

Foltz Decl., ¶ 19. It was Mr. Keller, not Mr. Foltz, who called Mr. Sorensen for the test and the notification that Mr. Sorensen was deemed positive for refusal to test came from U.S. Health Works, not Mr. Keller (who had no authority to terminate Mr. Sorensen). *Id.*, ¶ 18; Dkt. 23, Keller Decl., ¶ 8.

Thus, the evidence reflects that CPC terminated Mr. Sorensen pursuant to its substance abuse policy and there is no evidence that Mr. Sorensen was treated any differently than any other employee subject to random testing requirements. Dkt. 22, Foltz Decl., Ex. 3 (Sorensen termination letter); Ex. 2 (termination letters for other employees who refused to test).

When asked in his deposition whether he still believed he was not randomly selected for the January 28, 2016 test, Mr. Sorensen acknowledged that he was "undecided" about whether the test was random. Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep. 160:6–12. Mr. Sorensen also testified that he was "only guessing" when asked whether he had any evidence that CPC terminated him to "get out of paying a claim." *Id.*, Franz Decl., Ex. 1, Sorensen Dep. 165:11–19.

Defendants argue that, to have specifically targeted Mr. Sorensen with a fabricated random test would have required a grand conspiracy between Mr. Keller, Mr. Foltz (director of the drug and alcohol testing program who had never met Mr. Sorensen and was the only person with the authority to terminate him), NDI, and U.S. Health Works to violate DOT regulations, commit fraud, fabricate a fraudulent random list of employees to include Mr. Sorensen, and document the lie consistently across all these entities' records. Even if such a conspiracy could be proven, Mr. Sorensen could simply have avoided termination had he stayed at the test center for three hours.

For the first time, Mr. Sorensen claims that CPC failed to accommodate his condition because he "tried" to tell the tester that he was on medication that affected his ability to produce

a sample. Dkt. 25 at 1–7. This new allegation does not avail Mr. Sorensen because the testing center is run by U.S. Health Works, not CPC. Moreover, Mr. Sorensen testified in his deposition that he never actually told the tester he was on medication and even though he had his prescription bottle in his pocket, he admits he never took it out of his pocket to show the tester. Dkt. 24, Franz Dec., Ex. 1, Sorensen Dep. 175:11–177:13.

Mr. Sorensen also argues that CPC forced him "to undergo a test he could not complete" because his difficulty urinating affected his ability to provide an adequate sample. Dkt. 25, p. 17:19–4. The undisputed record reflects however, that Mr. Sorensen was terminated for walking out of the testing center before time had expired – not for failing to provide an adequate sample. Dkt. 22, Foltz Decl., Ex. 3. If he had remained at the testing site for three hours and had still been unable to provide an adequate sample, DOT regulations require that U.S. Health Works allow him an opportunity to provide a medical explanation within five days. 49 C.F.R. § 40.193(c)–(d). Mr. Sorensen does not allege that his difficulty urinating physically prevented him from remaining at the testing center for three hours. Therefore, all Mr. Sorensen had to do to "complete" the test without being terminated was to follow the tester's instructions to remain at the site for three hours and attempt to provide a second sample—regardless of whether he would have ultimately been successful or the test was negative.  Notably, Mr. Sorensen did not call his supervisor or anyone at CPC to request an accommodation at any point after the tester told him leaving would constitute a positive test and before he left the testing site.

Mr. Sorensen also contends that CPC should have chosen an alternate employee in his place because he was out on indefinite medical leave. Dkt. 25, pp. 9-10. The undisputed evidence reflects that for the past ten years, CPC has required that its drivers on workers' compensation be included in the random selection pool because those employees usually return to their safety-

sensitive function of commercial driving, and CPC has not granted an exemption from reporting

for a random drug test to any employee solely because that employee is on workers'

compensation. Dkt. 22, Foltz Decl. ¶ 5; Dkt. 21, Blackwell Decl., ¶ 6; *Id*. Exs. 2–4. When CPC

sent the random lists of employees to be tested to its regional managers between 2014 and 2016,

CPC employee Robin Blackwell routinely included a reminder that "[a]s always, employees on

Worker's Comp are required to participate in random drug testing." Dkt. 21, Blackwell Decl.

Exs. 2–4.

       DOT regulations and CPC policy provide a reasonable accommodation for individuals,

like Mr. Sorensen, who may have medically explainable inabilities to regularly urinate, but Mr.

Sorensen did not take advantage of these rights. DOT and CPC do not punish employees who

complete the full testing process and are genuinely unable to provide a sufficient urine sample—

in fact, the regulations require those employees to be given an opportunity for a medical review.

49 CFR § 40.193(c)–(d). All Mr. Sorensen needed to do was complete the testing process

(whether or not he would have ultimately been successful in producing a sufficient sample) and

then follow up with medical justification for his inability to void. Here, Mr. Sorensen simply

refused to stay and left the test center before the three hours had expired. Dkt. 24, Franz Decl.,

Ex. 1, Sorensen Dep. 158:8–12. DOT regulations specifically define that as a refusal to test. 49

CFR § 40.193(b)(3).

       In his declaration, Mr. Sorensen states that he sent emails to CPC "trying to provide them

with notes [he] received from [his] doctors and other information about [his] drug test", but he

never received a response from CPC. Dkt. 27, ¶ 11, Exs. 4, 5, 6. Exhibit 6 appears to be printouts

by Robin Blumenthal of "notifications from the Website" from Mr. Sorensen on February 18,

2016 and February 22, 2015 (labeled "third attempt"), addressed to the Alcohol/Drug Program &

Compliance. *Id.*, Ex. 6. The emails indicate that Mr. Sorensen was communicating with Juan Moya with "F.M.C.S.A. Drug and Alcohol compliance dept." but it is unclear what information was sent and/or requested. *Id.*

Mr. Sorensen does not dispute that he was called for a DOT-required random test; that he drove himself to the test; that he was informed that leaving the test center before three hours had passed would constitute a positive test; that he left before the three hours was up; and that he was terminated the next day by a CPC employee who had never met him and did not know his medical condition; and that CPC applies its policy to terminate the employment of any employee who receives a positive test. While CPC was aware that Mr. Sorensen injured his shoulder and was on workers' compensation, it was not aware that Mr. Sorensen had difficulty urinating until the day of his test. Mr. Sorensen also admits in his declaration that the first time he provided medical documentation of his difficulty urinating to CPC was on February 18, 2016—21 days after he walked out of the test.[8]

Accordingly, Mr. Sorensen has failed to raise a genuine issue of material fact such that a reasonable jury could return a verdict in his favor on his disability discrimination claim. There is no evidence of a disability causing his inability to perform the essential functions of the job in question or evidence that his disability was a significant or substantial factor in CPC's decision to terminate him. Accordingly, Defendants are entitled to summary judgment on this claim.

**B.    Failure to Accommodate**

Mr. Sorensen also brings a claim against CPC for an alleged failure to "accommodate" his "disability" by modifying DOT testing requirements or CPC policy to allow Mr. Sorensen to

---

[8] This is in stark contrast to Mr. Sorensen's allegation in his complaint that he provided medical documentation to CPC "within a week of his termination." Dkt. 1-1, ¶ 2.15.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 22

skip his test. Mr. Sorensen describes the disability in this claim as his "inability to urinate." Dkt. 1-1, ¶ 3.6. For the reasons previously explained, a condition that did not affect Mr. Sorensen's daily activities cannot be deemed a disability, and on that ground alone, this claim fails.

In addition, there is no evidence that CPC was aware that Mr. Sorensen had difficulty urinating before he was called to test. Mr. Sorensen alleges in his complaint that he "put Defendants on notice of the effects of his medication on his urinary system and the limitations it placed on his ability to complete his drug test." Dkt. 1-1, ¶ 3.7. In his answers to interrogatories, Mr. Sorensen stated that he provided doctor's notes to CPC on February 1 and February 4, 2016. However, in his deposition, Mr. Sorensen testified that he did not provide these notes (or any other medical documentation) until February 18, 2016 —nearly three weeks after he walked out of his test. Dkt. 24, Ex. 1, Sorensen Dep. 215:8–216:18. Mr. Sorensen contends however, that CPC had access to his medical records related to his worker's compensation claim and could access his medical files through the Washington State Department of Labor & Industries. Dkt. 34 at 1-2. Through these records, he claims that CPC would have known of the exact date of his doctor's appointment and then unfairly targeted him because it "chose the one day … when it knew [he] had a pre-scheduled doctor's appointment pursuant to his worker's compensation claim." Dkt. 25 at 5:5-6. Mr. Sorensen provides no evidence to support this supposition. There is no evidence that any CPC employee with any role in Mr. Sorensen's random test or his termination knew the date and time of his appointment with his personal physician.

In addition, Mr. Sorensen has failed to draw a causal connection between his "disability" and his failure to comply with testing requirements, or to explain what "accommodations" were "medically necessary" for him to stay at the test center for the required amount of time. Mr. Sorensen has nowhere alleged that his difficulty urinating is what caused him to fail to complete

the testing process by leaving the test center early, even when he had been warned of the

consequences. Nor does Mr. Sorensen allege that his difficulty urinating made him physically

incapable of remaining at the test site for three hours, completing the testing process (even if he

was ultimately unsuccessful in producing a sufficient sample) and then following up with a

medical justification for his inability to void. *See, e.g.*, 49 CFR § 40.193(c)-(d).

Because his inability to urinate cannot be deemed a disability and there is no evidence

that CPC was aware of his inability to urinate before he was called to test, Mr. Sorensen cannot

establish a *prima facie* case for failure to accommodate and Defendants are entitled to summary

judgment on this claim.

**C.     Retaliation**

To establish a *prima facie* case of retaliation under RCW 49.60.210(1), a plaintiff must

show that (1) he or she engaged in statutorily protected activity, (2) he or she suffered an adverse

employment action, and (3) there was a causal link between his or her activity and the other

person's adverse action. *Currier v. Northland Servs., Inc.*, 182 Wash. App. 733, 742, 332 P.3d

1006, 1011 (2014). When a person reasonably believes he or she is opposing discriminatory

practices, RCW 49.60.210(1) protects that person whether or not the practice is actually

discriminatory. A plaintiff proves causation by showing that retaliation was a substantial factor

motivating the adverse employment action. If the plaintiff establishes a *prima facie* case, then the

defendant may rebut the claim by presenting evidence of a legitimate nondiscriminatory reason

for the adverse action. This shifts the burden back to the plaintiff to prove that the employer's

reason is pretextual. The trier of fact must then "choose between inferences when the record

contains reasonable but competing inferences of both discriminatory and nondiscriminatory

actions." *Currier*, 182 Wash. App. 733, 742, 332 P.3d 1006, 1011 (2014) (internal citations omitted).

Mr. Sorensen alleges that his worker's compensation claim was a "substantial factor" in his termination. Proof of a causal link between the filing of his worker's compensation claim and the adverse employment action is the final element of a *prima facie* case of retaliation. *Currier*, 182 Wash. App. at 747, 332 P.3d at 1013. Mr. Sorensen applied for workers' compensation more than a month before he was terminated and he testified that the process went "smooth," he received his payments, and CPC did not contest anything about his injury or monetary claims until months after he was terminated. Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep. 117:15–20. In addition, Mr. Sorensen had been on workers' compensation twice before with no issue while employed by CPC. *Id.*, Sorensen Dep. 165:20—166:16. Thus, Mr. Sorensen has failed to make a *prima facie* case of retaliatory discharge. In addition, CPC has produced competent summary judgment evidence showing that Mr. Sorensen's discharge was for a legitimate reason rather than retaliation, *i.e.,* Mr. Sorensen was terminated the day after walking out of a testing center against the tester's instructions, was deemed to have refused to test by U.S. Health Works, and was terminated by a CPC employee who did not know him.

Accordingly, there is no evidence that CPC's policy was a "pretext" for targeting Mr. Sorensen because of his worker's compensation claim and therefore, Defendants are entitled to summary judgment on this claim.

**D.    Wrongful Termination in Violation of Public Policy**

To establish a *prima facie* claim of wrongful termination, Mr. Sorensen has the burden to show that his "discharge may have been motivated by reasons that contravene a clear mandate of public policy." *Martin v. Gonzaga University*, 191 Wn.2d 712, 725, 425 P.3d 837, 844 (2018)

1 (quoting *Thompson*, 102 Wn.2d at 232, 685 P.2d 1081). Mr. Sorensen must also show "that the

2 public-policy-linked conduct was a 'significant factor' in the decision to discharge [him]."

3 *Martin*, 191 Wn.2d at 725–26, 425 P.3d at 844 (quoting *Wilmot*, 118 Wash.2d at 75, 821 P.2d

4 18). If Mr. Sorensen succeeds in presenting a *prima facie* case, the burden then shifts to CPC to

5 produce a legitimate nonpretextual, nonretaliatory reason for the discharge.[9] If CPC articulates

6 such a reason, the burden shifts back to Mr. Sorensen either to show that the reason is pretextual,

7 or by showing that although the employer's stated reason is legitimate, the public-policy-linked

8 conduct was nevertheless a substantial factor motivating the employer to discharge him. *Martin*,

9 191 Wn.2d at 725–26, 425 P.3d at 844 (internal citations and quotations omitted).

10      The basis for Mr. Sorensen's wrongful termination claim is that he applied for worker's

11 compensation and was terminated shortly thereafter for complying with the requirements of his

12 claim. Dkt. 25, p. 20. As previously discussed, Mr. Sorensen has failed to establish any causal

13 link between his workers' compensation claim and his termination. Mr. Sorensen had been on

14 workers' compensation twice before with no issue while employed by CPC and his most recent

15 claim was made over a month before he was terminated, he received his payments, and CPC did

16 not contest anything about his injury or monetary claims until months *after* Mr. Sorensen was

17 terminated. Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep. 117:15–20; 165:20—166:16.

18      CPC has also provided evidence of a legitimate reason for Mr. Sorensen's termination,

19 *i.e.*, violation of a decades-long CPC policy and DOT regulations that require random drug

20

21 _____

22 [9] This is a burden of production, not persuasion. The employer must produce relevant admissible evidence of another motivation, but need not do so by the preponderance of evidence necessary to sustain the burden of persuasion, because the employer does not have that burden. *Martin*, 191

23 Wn.2d at 725–26, 425 P.3d at 844 (internal citations and quotations omitted).

testing.[10] DOT regulations specifically define the conduct that constitutes a refusal. Employees who do not remain at the test site until they have provided a sufficient sample or three hours have passed are deemed to have refused to test. 49 CFR § 40.193(b)(1)–(3). DOT regulations further state that an employee "has refused to take a drug test" if he or she fails "to remain at the testing site until the testing process is complete," or if the employee "fails to cooperate with any part of the testing process." 49 CFR § 40.191(a)(2), (8). Mr. Sorensen does not contest that he was advised that leaving the test center at the time he did would be deemed a positive test, and does not contest that he failed to remain at the testing site until the testing process was complete.

The regulations and CPC's policy make no distinction between refusing a test, refusing to take a test, and refusing to submit to a test. CPC policy specifically incorporates the DOT's definition of refusal into its policies. Dkt. 22, Foltz Decl. Ex. 1 at 9 ("Under the regulations, a driver will be considered to have refused to submit to a required test if . . ."). In addition, CPC's policy states that any employee who tests positive "shall be removed from safety sensitive functions and shall be terminated by CPC." *Id.*, Foltz. Decl. Ex. 1 at 9.

Mr. Sorensen has failed to establish that his "discharge may have been motivated by reasons that contravene a clear mandate of public policy" and therefore, Defendants are entitled to summary judgment on this claim.

**E.      Wrongful Withholding of Wages**

Mr. Sorensen alleged in his complaint that CPC "intentionally paid [him] a lower wage

---

[10] To the extent Mr. Sorensen now attempts to raise a disparate impact claim, he did not raise such a claim in his complaint and for that reason alone, the claim may be disregarded by the Court. In addition, there is no evidence that CPC did not apply its random testing policy consistently to include all of its employees, even those who were on workers' compensation. Dkt. 21, Blackwell Decl., ¶¶ 5–6, Exs. 2–4.

than the wage Defendants were obligated to pay him." Dkt. 1-1, ¶ 3.21. In his response to Defendants' summary judgment motion, he alleges that CPC failed to factor overtime hours into his pay formula and did not inform him of his pay formula. Dkt. 25 at 22. These latter allegations are contradicted by Mr. Sorensen's deposition testimony. Mr. Sorensen was aware that CPC's delivery drivers were paid on a straight hourly rate, and that relay drivers were paid on a mileage plus hourly formula. Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep. 38:15–39:3. He also testified that every time his pay changed, he received and signed a form that explained the change. *Id.*, Sorensen Dep. 78:11–82:2. Mr. Sorensen's paychecks and earnings statements also showed the exact per-mile and per-hour rate that Mr. Sorensen made. *Id.*, Franz Decl. Ex. 7. At his deposition, Mr. Sorensen described how he was paid for different portions of his shifts. *Id.*, Ex. 1, Sorensen Dep. 38:15–39–40:9.

With regard to Mr. Sorensen's original allegation that CPC paid him less than required, RCW 49.46.130(a) requires employers to pay employees not less than one and one-half times their regular rate of pay for hours worked in excess of forty hours per week. However, RCW 49.46.130(2)(f) exempts from the time and one half requirements drivers subject to the Federal Motor Carrier Act (49 U.S.C. Sec. 3101 et seq. and 49 U.S.C. Sec. 10101 et seq.), as long as the compensation system under which the driver is paid "includes overtime pay, reasonably equivalent to that required by this subsection, for working longer than forty hours per week."

To be reasonably equivalent, there need not be a direct correlation between overtime hours worked and the overtime pay component of driver pay. *See General Teamsters Local No. 174 ex rel. Gasca v. Safey, Inc.*, 156 Wn. App. 1003, 2010 WL 1981821, at *6 (citing *Schneider v. Snyder's Foods, Inc.*, 116 Wn. App. 706, 715, 66 P.3d 640 (2003)). Truck drivers may be paid on a mileage rate, regardless of the number of hours worked, if the rate "is reasonably calculated

to include compensation for both straight time and time-and-a-half." *Helde v. Knight Transp., Inc.*, 982 F.Supp.2d 1189, 1201 (W.D. Wash. 2013). The hourly rate trucking companies pay their local or short-haul drivers may be used as the "base rate of pay" for evaluating the reasonable equivalence of an alternative compensation system. *Id*. Alternatively, the local hourly rate other trucking companies pay may be an acceptable starting base rate for determining reasonable equivalency. *Mendis v. Schneider National Carriers Inc.*, 2016 WL 6650992, at *7 (W.D. Wash. 2016) (unpublished).

An employer may use the hourly rate of local drivers for comparison purposes in determining the reasonable equivalence of a mileage rate. *Mynatt v. Gordon Trucking, Inc.*, 183 Wn. App. 253, 266 n. 9, 333 P.3d 442 (2014) (citing Administrative Policy ES.A.3(B)(3)(c)(iii), which supports comparing mileage-based line haul drivers' gross pay to what it would have been if they had been paid hourly, with overtime, at local driver rates).

The method CPC uses to pay its relay drivers is nearly identical to the method approved of in the *Mynatt* case. CPC's formula is designed to calculate in overtime for relay drivers and data from CPC's payroll records (which Mr. Sorensen agrees are accurate) prove Mr. Sorensen made more—even accounting for overtime hours—than under Mr. Sorensen's preferred formula. Mr. Sorensen testified at his deposition that he always recorded his hours and mileage accurately (Dkt. 24, Franz Decl., Ex. 1, Sorensen Dep. 42:13–16); every time he believed there was a malfunction, he corrected it (*id*., Sorensen Dep. 43:4–6); he has no reason to believe that CPC's payroll data showing his mileage and hours is inaccurate (*id*., Sorensen Dep. 62:3–11); and he has no reason to believe his paychecks did not ultimately reflect the correct amount of pay for the correct number of miles and hours he worked, at the correct rates (*id*., Sorensen Dep 49:12–22). According to CPC's records, Mr. Sorensen would have received less had he been paid the

mean or median rates for Washington-based tractor-trailer-truck drivers because those rates are substantially lower than the applicable hourly rate that CPC paid its drivers. Mr. Sorensen has never challenged CPC's calculations or contested that he was paid more under his mileage plus hourly rate than he would have been under the same hourly rate plus overtime.

Accordingly, Defendants are entitled to summary judgment on Mr. Sorensen's wrongful withholding of wages claim.

## CONCLUSION

The motion for summary judgment of Defendants CPC Special Logistics LLC and Larry Keller (Dkt. 20) is **GRANTED**. Plaintiff Matthew Sorensen's claims against Defendants are dismissed **with prejudice**.

DATED this 23rd day of April, 2019.

_____
BRIAN A. TSUCHIDA
Chief United States Magistrate Judge